Filed 1/16/14  In re A.C. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SIMONE C.,<br><br>        Defendant and Appellant. | A138806<br><br>(San Francisco County<br>Super. Ct. No. JD11-3093) |

Simone C., the mother of A.C., appeals from the orders denying her Welfare and Institutions Code[1] section 388 petition and terminating her parental rights.  She contends that the juvenile court abused its discretion in denying her section 388 petition for reinstatement of reunification or family maintenance services, and that it erred in finding that the beneficial relationship exception to adoption did not apply.  We affirm.

## I.  FACTUAL BACKGROUND

This court has previously set forth the facts which brought A.C. within the jurisdiction of the juvenile court in our opinion on mother's petition for an extraordinary writ seeking to set aside the court's order setting a section 366.26 hearing.  (*Simone C. v.*

_____

[1] All further statutory references are to the Welfare and Institutions Code.

1

*Superior Court* (Jan. 31, 2013, A137120) [nonpub. opn.] (*Simone C.*).) On May 11, 2011, the court sustained jurisdiction based on findings that A.C. tested positive for methamphetamine at birth, that mother had a long history of substance abuse, and that she failed to reunify with A.C.'s half-sibling, who was currently in a long-term placement with a relative. (*Simone C.*, at pp. 1–2.) Mother did not contest jurisdiction. (*Id.* at p. 2.) A.C. was placed in foster care and was moved to a fost-adopt home in September 2011. (*Id.* at p. 2.) Mother received reunification services for over 18 months including outpatient and inpatient treatment, individual therapy, a psychological evaluation, and parenting services. (*Id.* at pp. 2–6.) Mother visited regularly with A.C. up to six hours twice a week. (*Id.* at pp. 2–3.) Mother, however, struggled with her substance abuse treatment. She was discharged from the Walden House program due to drug abuse, and she was terminated from the Drug Dependency Court due to noncompliance. (*Id.* at p. 2.) She also tested positive for drugs during the initial six months of reunification services. (*Ibid.*) Though the San Francisco Human Services Agency (the Agency) opined that mother needed a residential treatment program to address her substance abuse issues, the court granted mother's request in March 2012 to change her reunification requirements to an outpatient substance abuse treatment program. (*Id.* at p. 3.)

The Agency reported that mother had made substantial progress in her reunification program at the 12-month review hearing on August 21, 2012. (*Simone C., supra*, A137120, at p. 3.) On September 7, 2012, however, mother told the Agency that she had used drugs on September 4, 2012. (*Id.* at p. 4.) She tested positive for methamphetamine. (*Ibid.*) The court thereafter granted counsel for A.C.'s ex parte application to change mother's visitation schedule from two unsupervised visits per week to one supervised visit. (*Ibid.*)

The 18-month review hearing was held in November 2012. (*Simone C., supra,* A137120, at p. 4.) The Agency recommended that reunification services be terminated in light of mother's unresolved substance abuse and mental health issues. (*Ibid.*) While mother was then amenable to entering a residential treatment program, the Agency opined that resolution of mother's substance abuse issues could not await A.C.'s need for

permanency.  (*Ibid.*)  A.C. continued to live in the same fost-adopt home where she had been placed at the age of six months with foster parents who wished to adopt her, and who were providing a loving and supportive home.  (*Ibid.*)

The court terminated reunification services and set the matter for a section 366.26 hearing.  (*Simone C.*, *supra*, A137120, at p. 6.)  Mother thereafter moved for an order appointing an expert to conduct a bonding study of mother and A.C.  The Agency and counsel for A.C. opposed the motion, arguing that the motion was untimely, there were no compelling circumstances warranting the study, and the appointment of an expert could result in unduly delaying permanency for A.C.  On December 17, 2012, the court denied the motion.  Mother did not appeal the court's order.

On January 31, 2013, we denied mother's petition for an extraordinary writ on the merits.  (*Simone C.*, *supra*, A137120, at p. 10.)

On February 21, 2013, the Agency filed its report for the section 366.26 hearing, and recommended that parental rights be terminated.  It noted that A.C. continued to thrive with her prospective adoptive parents.  The Agency recognized that mother loves her daughter and she has had regular, positive, caring visitation with her.  It opined, however, that mother's substance abuse and mental health issues continue, and she is in need of long-term treatment.  The Agency therefore recommended adoption as the appropriate plan.  The adoptive home study of the prospective parents had been completed and accepted by the Agency.  The Agency's report further noted that the prospective adoptive parents were open to a post-adoption contact agreement with mother, and have met with a facilitator to discuss future visitation.

Four days before the scheduled section 366.26 hearing, mother petitioned the court pursuant to section 388 for the return of A.C. to her care, and for an order granting family maintenance services.  She contended that she had maintained her sobriety, had improved her coping skills, and had increased her treatment activities consistent with the testimony of the Agency's expert.  She also asserted that she had consistently visited A.C., had a bond and strong connection with her, and that "any concerns about her abilities to cope with stressful circumstances [were] diminished by her proven track record of remaining

3

clean and sober in the face of major challenges." She included test results of hair follicle testing that showed she had tested negative for all illicit substances, and a letter verifying her weekly attendance in mental health therapy including dialectical behavior therapy (DBT) since September 20, 2011.

The hearing on mother's section 388 motion began on April 12, 2013, and continued with the section 366.26 matter on May 10, 2013. Mother presented the following evidence on her section 388 motion: Melloney Carroll, a parent educator aid at the Family Resource Center, testified that she had supervised visitation between mother and A.C. since September 2012. Carroll testified that mother was attentive with A.C., showed affection, provided structure and encouragement, and acted appropriately during the supervised visits. Mother also completed a parent education class.

B. K., mother's friend, testified that she met mother through A.C.'s father who is also the father of B.K.'s five-year-old son. She testified that she saw mother and A.C. often and that she and her son had play dates with them when mother had unsupervised visits. She opined that mother and A.C. had a very strong bond and that A.C. called mother, "mommy."

Mother testified and asked that A.C. be returned to her. She testified about her visits and activities with A.C. and about the bond they had developed. She has a two-bedroom apartment where she has lived for 11 years in which A.C. has her own room. She has a steady income and could provide for A.C.'s care and needs. Mother has treatment services each weekday including therapy, safety group, acupuncture and yoga, and could utilize the child care services at the therapy centers. B.K. had also offered to assist with child care. Photographs of mother and A.C. enjoying their visits were admitted into evidence.

Following mother's presentation of her case on the section 388 motion, the Agency moved for nonsuit, contending that mother had not met her burden of showing either changed circumstances or that granting the petition was in A.C.'s best interests. The juvenile court denied the motion. The court was impressed with mother's sobriety and the steps she had taken to improve her life in the months following the 18-month

4

review hearing. But, the court found that mother had not demonstrated changed circumstances. Her visits with A.C., who was now two years old, were still supervised. The court found A.C. had known only one home since she was six months old and it would not be in her best interests to separate her from that home and the only family she has known.[2]

The court proceeded with the section 366.26 hearing. Andrea Lego, the Agency's child welfare worker, who had been assigned to the case and prepared the section 366.26 report, recommended that parental rights be terminated and that adoption be ordered as the permanent plan for A.C. She testified that A.C. was adoptable and was living with foster parents in an approved adoptive home where she had lived for over a year and a half. Lego also opined that A.C. was attached and very bonded to her foster parents.

The court terminated mother's parental rights finding that, while she consistently visited A.C., she had not established the parental bond required to show that A.C. would benefit from continuing the relationship.[3]

## II. DISCUSSION

### A. *Section 388 petition*

Mother contends that the trial court abused its discretion in denying her section 388 petition because she demonstrated that she consistently visited with A.C. and that she had engaged in DBT therapy and learned the techniques to address her coping deficits.

"Section 388 permits a parent to petition the court on the basis of a change of circumstances or new evidence for a hearing to change, modify or set aside a previous order in the dependency. The parent bears the burden of showing both a change of circumstance exists and that the proposed change is in the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) We may not disturb the

---

[2] The prospective adoptive parents have a six-year-old son to whom A.C. is also attached. The court acknowledged this relationship in making its finding.

[3] The court also terminated father's parental rights. Father was represented at the hearing and joined in the Agency's recommendation to find adoption to be the appropriate permanent plan.

decision of the juvenile court absent a clear showing that the court abused its discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Here, the court found that mother had not shown changed circumstances. While she had regularly and consistently visited A.C. throughout the dependency proceedings, she had suffered a relapse in her substance abuse in September 2012, just two months prior to the 18-month review hearing. Consequently, though she had progressed to unsupervised visitation, the court ordered that visitation be modified to supervised visits following her relapse. Hence, unfortunately, mother's relapse, after almost a year of sobriety, created a substantial risk of detriment to A.C.'s safety.

Once reunification services are terminated at the 18-month review hearing, the focus of the dependency proceedings shifts to a child's need for stability and permanence. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).) While mother's current sobriety and engagement in extensive treatment services are commendable, A.C.'s needs outweigh mother's interest in reunification. (*Ibid.*) Under the dependency statutory scheme, "[t]he parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*Ibid.*) "After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point the focus shifts to the needs of the child for permanency and stability." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

The record demonstrates that A.C. needs a stable and permanent home. She is fortunate to have a prospective adoptive home with foster parents with whom she has lived since September 2011. A.C. is very bonded with her foster parents and they wish to adopt her. Her need for stability and permanence outweighs mother's interest in another attempt at reunification. "At the point of these proceedings—on the eve of the section 366.26 permanency planning hearing—the [child's] interest in stability was the court's foremost concern and outweighed any interest in reunification." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) While mother had made substantial progress in her treatment activities in the several months prior to the section 388 hearing, the court had before it a

6

record of a history of serious substance abuse and mental health issues.[4] Moreover, mother had not yet again progressed to unsupervised visitation and had never had A.C. in her home overnight. Given the extensive and long history of this case, A.C. needs the opportunity she has now for an adoptive home with her prospective adoptive parents who are providing her with a loving and supportive home. The court properly denied mother's request for a return of A.C. to her care and for family maintenance services.

Mother also contends that the court's denial of her section 388 petition denied her due process. The *Marilyn H.* court recognized that section 388 provides a parent with substantive and procedural due process. (*Marilyn H., supra,* 5 Cal.4th at p. 309.) "Sections 366.26 and 388, when construed together and with the legislative scheme as a whole, are reasonable and bear a substantial relation to the objective sought to be attained. The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority. Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status. Thus, both substantive and procedural due process are satisfied." (*Ibid.*)

Here, the court complied with the dependency statutory scheme and gave mother ample opportunity to present her section 388 petition. The record demonstrates that the court did not abuse its discretion in denying mother's petition. (See *In re B.C.* (2011) 192 Cal.App.4th 129, 141 [section 388 petition is reviewed for abuse of discretion].)

---

[4] We acknowledge that mother participated in DBT therapy as recommended by Dr. Collins at the 18-month review hearing. But Dr. Collins testified that it would typically take 12 to 15 weeks to build the skills in DBT treatment and then after the skill building phase, an additional eight to 12 months of therapy in order to reach an optimal level of functioning.

7

*2. Section 366.26 hearing*

Mother contends that the court erred in not applying the section 366.26, subdivision (c)(1)(B)(i) exception to termination of parental rights because A.C. would benefit from continuing their relationship.

Section 366.26, subdivision (c)(1)(B)(i) provides that the denial of reunification services "shall constitute a sufficient basis for termination of parental rights. Under these circumstances, the court shall terminate parental rights unless either of the following applies: [¶] . . . [¶] (B) . . . [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parents have the burden of proving the applicability of the exception. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 773; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)

The *Autumn H.* court recognized that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) The exception under section 366.26, subdivision (c)(1)(B)(i) applies only when the relationship with the natural parent "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Only if "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed [is] the preference for adoption . . . overcome [so that] the natural parent's rights are not terminated." (*Ibid.*) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.)

8

Relying on *In re Amber M.* (2002) 103 Cal.App.4th 681 and *In re S.B.* (2008) 164 Cal.App.4th 289, mother contends that the court erred in not applying the subdivision (c)(1)(B)(i) exception here. Both cases are distinguishable.

In *Amber M.*, the court held that the mother's evidence showed a beneficial parental relationship outweighing the benefit of adoption. (*Amber M., supra,* 103 Cal.App.4th at p. 689.) There, the oldest of the three children, who was seven at the time of the section 366.26 hearing, had been in the mother's care for most of her life while her brother, nearly five, had been in the mother's care for more than half of his life. It was undisputed that the older two children had a strong parental bond with the mother, that the youngest child, nearly three, was strongly attached to her, and that mother was devoted to them and did virtually all that was asked of her to regain custody. (*Id.* at pp. 689–690.) In addition, a psychologist who conducted a bonding study of the mother and the eldest child concluded that it would be detrimental to sever the relationship. (*Id.* at p. 689.) Given the mother's unusually strong factual showing, the appellate court held that the juvenile court erred in declining to apply the exception. (*Id.* at pp. 690–691.)

Similarly in *In re S.B.*, the father was the primary caregiver for three years, and when his daughter was removed from parental custody, he immediately started services, maintained his sobriety, sought medical and psychological services, and maintained consistent visitation. (*In re S.B., supra*, 164 Cal.App.4th at p. 298.) In short, he complied with his case plan, but his current health problems, including posttraumatic stress disorder, impeded his ability to care for his daughter full time. (*Id.* at pp. 294, 298.) The evidence also included a bonding study that indicated a strong bond between the father and daughter and that there was a potential for harm if she lost the parent-child relationship. (*Id.* at pp. 295–296.) The court held that the evidence showed that the daughter would be greatly harmed by the loss of her significant relationship with her father. (*Id.* at p. 301.)

Here, by contrast, A.C. was detained at birth and has lived her entire life in foster care; the majority of that time—one and a half years—with her prospective adoptive parents. She has a strong attachment and bond to her adoptive parents and looks to them

9

for comfort and security. While there is no question that mother consistently visited with A.C. and maintained a loving and emotional bond with her, the record does not support a finding that continuation of the natural parent/child relationship outweighs the well-being A.C. would gain by adoption. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) A.C.'s need for a stable, consistent environment outweighs any benefit she would derive from continuing her relationship with mother.[5] There was insufficient evidence presented that A.C. would suffer detriment from termination of her relationship with mother.[6] (See *In re Angel B., supra,* 97 Cal.App.4th at p. 468 [no hint in the record that child would suffer harm if visits with child's mother were to end].) The court did not err in finding that the subdivision (c)(1)(B)(i) exception did not apply.

## III. DISPOSITION

The orders are affirmed.

---

[5] We note that the prospective adoptive parents have expressed their commitment to continuing contact with mother post-adoption.

[6] Mother also argues that the court erred in denying her request for a bonding study. Mother moved for a bonding study on November 28, 2012, after reunification services were terminated and just three months before the March 2013 date set for the section 366.26 hearing. The court denied the motion and mother failed to appeal. She cannot now raise the issue.

10

_____

Rivera, J.

We concur:


_____

Ruvolo, P.J.


_____

Reardon, J.


11